1:23 MJ 4272

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Casey T. Carty, a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), Cleveland Division, being duly sworn, depose and state as follows:

## INTRODUCTION

1. I have been employed as an SA of the FBI since April 2004, and am currently assigned to the FBI's Cleveland Division. While employed by the FBI, I have conducted investigations of numerous federal criminal offenses including white collar crimes, crimes against children, violent crimes and narcotics offenses. I have gained experience through training at the FBI Academy and everyday work related to these types of investigations.

2. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7) and empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

3. This affidavit is being submitted for the limited purpose of establishing probable cause that Tsz Chun Xie ("Xie"), age 21, of Rowland Heights, California, has violated Title 18, United States Code, 1956(h), Money Laundering Conspiracy. The statements contained in this affidavit are derived from information provided to me by members of the Lorain County Sheriff's Office ("LCSO") as well as my own investigation of this matter. This affidavit does not include every fact known to me regarding this investigation but will seek to summarize relevant information.

## PROBABLE CAUSE

4. On August 22, 2023, a 69-year-old Wellington, Ohio resident ("Victim 1", or "V-1"), reported to the LCSO that he received a notification on his computer (purportedly from

1

Microsoft) indicating his computer had been hacked and instructing him to call a telephone number for assistance.  After calling the number, V-1 was told by a male with a foreign accent his personal information was compromised and his financial holdings were at risk.  V-1 gave whomever it was he spoke with remote access to his computer. A member of the conspiracy contacted V-1 and claimed to represent the Internal Revenue Service ("IRS") and directed V-1 to withdraw $26,000 from his bank account and put it in a gift-wrapped box.  It so happened that V-1 had approximately $26,000 in his account at the time. A member of the conspiracy told V-1 the fraud could be an "inside job," and admonished V-1 to not discuss the reason for his withdrawal with his bank.  A member of the conspiracy instructed V-1 to send a photograph of the gift-wrapped box to the purported IRS representative.  A member of the conspiracy instructed told V-1 that a deputy United States Marshal would come to his house on August 23, 2023 at approximately 10:00 a.m. to collect the box for safekeeping.  LCSO personnel told V-1 this was a scam and instructed him to return his money to the bank.[1]

5. V-1 agreed to assist LCSO personnel with further investigation of this fraud and the purported deputy United States Marshal who was to come to his home the next day.  V-1 secured his cash from the gift-wrapped box and replaced it with scraps of paper.

6. On August 23, 2023, LCSO personnel established surveillance in the area of V-1's residence and an LCSO Detective was stationed inside V-1's residence with him.  At approximately 10:45 a.m., a red Toyota Camry pulled into the driveway at V-1's residence.  At that moment, V-1's phone rang, and a member of the conspiracy instructed V-1 to give the gift-wrapped package to the occupant of the car.  The rear passenger of the car, later identified as

---

[1] The information presented in Paragraph 4 is a summary of the information provided by V-1 in his initial contact with LCSO and in a subsequent interview with me on September 12, 2023.

Xie, exited the car, met with V-1, took possession of the package, and returned to the car. As the car backed out of the driveway, LCSO deputies executed a traffic stop and took Xie into custody. The vehicle was determined to be from a ride-share company which had been hired by Xie at Cleveland Hopkins Airport. The driver of this vehicle was sent on his way.

7. After he was taken into custody, an LCSO Detective advised Xie of his Miranda rights. Xie indicated he understood his rights and agreed to speak with Detectives on scene. Xie told Detectives a friend offered to pay him to travel from California to Ohio to pick up some "stuff." Xie was transported back to the LCSO for further investigation.

8. At LCSO, Xie was interviewed by an LCSO Detective and me and provided the following information: Xie flew from Ontario, California to Cleveland at the direction of a male whom he could identify only by the nickname "Cat". "Cat" provided Xie with V-1's address and Xie's job was to travel to Cleveland, hire a car to take him to V-1's address, pick up a package from V-1, then return to California. Xie admitted to having taken at least six other such trips during July and August 2023.

9. In one such trip, Xie flew from California to South Carolina in early August 2023 at "Cat's" direction. He flew via American Airlines and his air travel from California to South Carolina included a connecting flight along the way. On arrival in South Carolina, he took a ride share to an address which had been provided by "Cat" and met with a white male who gave him a brown paper bag which was taped shut. Xie did not look inside the bag because he "already knew it was a dangerous action," but it felt as if it contained cash. He stuffed the bag into his backpack and flew back to California. Upon returning to California, he met with a male in the parking lot of a CVS store and gave him the bag of cash. This male was sent by "Cat", and he gave Xie $2,000 for his work.

10. Xie described taking similar trips to Seattle and other cities throughout the U.S. but was unable to recall specifics of those trips without looking through his cell phone. These trips involved the "same situation" as his Cleveland and South Carolina trips, by which he meant he would fly to a city, hail a ride share to an address provided by "Cat," collect a package from someone at the address, then return to California. Xie asked "Cat" if the packages he picked up contained drugs, and "Cat" assured him they did not. Xie admitted that although picking up packages of cash was "really a big deal," he knew picking up packages of drugs was "way more big deal." Upon returning to California he would meet with a male sent by "Cat" to turn over the package he had picked up and to be paid for his work. He met with a different male every time, some were white and some were Asian, and they met in different locations throughout the Los Angeles area each time.

11. In addition to picking up packages of cash for "Cat," Xie also worked with "Cat" to facilitate fraudulent wire transfers. In describing his involvement with facilitating these wires, Xie recalled that in approximately Spring 2023, "Cat" wired roughly $50,000 into Xie's account at Bank of America. Bank of America closed Xie's account promptly after this wire was transferred into the account because the wire was deemed "suspicious." Xie had this Bank of America account before he met "Cat" and it was to this account that his mother in Hong Kong would transfer money for Xie's living expenses. Xie described the wires from his mother as "legal," and he contrasted them with the practice of receiving wires from "Cat" by stating "I can feel it's illegal."

12. Shortly after the wire involving his Bank of America account, Xie assisted "Cat" with another fraudulent wire transfer using an account at Chase Bank. Xie opened an account at Chase Bank and "Cat" told him to use it for a while like a normal bank account. Xie opened this

account with the intent to receive wires from "Cat" and then withdraw the money according to the "usual protocol", which he explained involved meeting with someone to hand over the cash as he did with the cash pick-ups.

13. About a month after opening the Chase Bank account, Xie received a $35,000 wire from "Cat." He withdrew roughly $34,500 in cash from the account and met with a male who was sent by "Cat" in a parking lot somewhere in Chino, CA. Xie handed over the cash to this male, keeping $500 for himself. Promptly after this wire transfer, Chase Bank closed Xie's account due to the suspicious nature of the wire.

14. After the Chase Bank wire resulted in yet another of Xie's bank accounts being closed by the bank, he and "Cat" moved on to the "package thing."

15. At the time of Xie's arrest by LCSO, he possessed an Apple iPhone. LCSO sought and obtained a warrant authorizing a search of the phone from the Lorain County Court of Common Pleas. The warrant authorized a search of the phone for evidence of theft and identity fraud. The contents of the phone were forensically extracted using the Cellebrite extraction tool and compiled in a report which I have reviewed. Additionally, I obtained travel records from American, United and Delta Airlines.

16. Through my review of the cell phone extraction and records provided by the airlines, I located detailed corroboration of Xie's travel throughout the U.S. during July and August 2023. Airline records obtained thus far indicate Xie made round trip flights from Los Angeles-area airports to multiple cities throughout the U.S. between July 29 and August 11, 2023. These trips were of short duration, often involving same day round trip travel from Los Angeles to cities as far from Los Angeles as Indianapolis. The cell phone extraction report adds further corroboration of Xie's travel as it included Xie's communication history with Uber. By

comparing the airline records with Uber records, a pattern emerged. On multiple occasions, Xie landed in a city, ordered a round trip Uber from that city's airport to a residence, then departed from the airport soon thereafter.

17. In one such instance, on August 2, 2023 Xie flew from Los Angeles to Spokane, WA, by way of Seattle. On arrival, he hailed a round trip Uber from the Spokane International Airport to a residence in Spokane. Xie flew back to Los Angeles later that day.

18. On October 3, 2023, at FBI Cleveland's request, an agent from the FBI's Spokane Resident Agency contacted the 73-year-old female at this Spokane residence ("Victim-2" or "V-2"). V-2 reported that on or about May 15, 2023 she received a warning on her computer (purportedly from Microsoft) that her computer was infected with child pornography. V-2 called the number associated with the warning and gave whomever she spoke with remote access to her computer. V-2 was told by a male with a foreign accent she could get into trouble for the child pornography, and that he could help her secure her money. In response to these solicitations, V-2 began transferring funds according to instructions provided by whomever it was she spoke with. In June 2023, V-2 made two deposits totaling $10,000 into a Bitcoin wallet, followed by a $39,000 wire transfer to an account at a bank in Hong Kong. Continuing to follow the instructions, V-2 handed over two separate gift-wrapped packages, one containing $45,000 in cash, the other with $25,000, to individuals who came to her house. She recalled giving the package with $25,000 in early August. V-2 was shown a photo of Xie and stated that he may have been the individual to whom she gave the $25,000 package.

19. As of the date of this complaint, four FBI Field Offices have been requested to contact residents at addresses located in Xie's Uber history described above in Paragraph 16. I

believe those contacts will reveal additional instances where Xie and/or his co-conspirators took possession of cash from as yet unidentified fraud victims.

## CONCLUSION

20. Based on the preceding, I believe probable cause exists that Xie has violated Title 18, United States Code, Section 1956(h), Money Laundering Conspiracy.

Casey T. Carty
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable electronic means. Fed. R. Crim. P. 3, 4(d), and 4.1.

Jonathan D. Greenberg
United States Magistrate Judge



11-14-2023
Date

7